IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

|  |  |  |
|---|---|---|
| JAMARCUS BROWN, as next of kin of Rocky Darrin Brown, deceased, and on behalf of the wrongful death beneficiaries of Rocky Darrin Brown, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 2:18-cv-2740 |
| QUINCE NURSING AND REHABILITATION CENTER, LLC, d/b/a QUINCE NURSING AND REHABILITATION CENTER; AURORA CARES, LLC; DTD HC, LLC; D&N, LLC; DONALD T. DENZ; and NORBERT A. BENNETT, | ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) ) | |

**ORDER**

Before the Court is the Magistrate Judge's Report and Recommendation (the "Report"), dated February 7, 2019. (ECF No. 31.) The Report recommends denying Defendant Quince Nursing and Rehabilitation Center, LLC's ("Quince") November 2, 2018 Motion to Compel Arbitration and Stay Proceedings, (ECF No. 8). (ECF No. 31.) Since the Report, Quince has objected, (ECF No. 32), Plaintiff Jamarcus Brown has responded to Quince's objections, (ECF Nos. 33-34), Quince has filed supplemental objections, (ECF No. 36), Jamarcus Brown has moved to strike the supplemental

objections, (ECF No. 37), Quince has responded to the motion to strike, (ECF No. 39), Jamarcus Brown has moved for leave to file a reply to the motion to strike (ECF No. 40), and Quince has replied to Jamarcus Brown's reply to motion to strike, (ECF No. 41) (collectively, the "Related Motions"). Jamarcus Brown has filed supplemental authority. (ECF Nos. 47, 50.) Quince responded to that supplemental authority. (ECF No. 57.) Jamarcus Brown replied. (ECF No. 58.)

For the following reasons, Quince's objections are OVERRULED. The Report's recommendations are ADOPTED. Quince's Motion to Compel Arbitration and Stay Proceedings is DENIED. The Related Motions are DENIED.

## I.   Background

Rocky Brown was a resident of Quince Nursing and Rehabilitation Center from about April 24, 2017, to November 28, 2017. (ECF No. 1-1 at 8 ¶ 2.) When Rocky Brown was admitted, Gladys Pratchart, Rocky Brown's mother, signed a Resident and Facility Arbitration Agreement (the "Agreement"). (ECF No. 8-2; ECF No. 10 at 2.) The Agreement provides, inter alia, that "[a]ny and all disputes between the Resident and the Facility shall be submitted to binding arbitration . . . ." (ECF No. 8-2 ¶ 3.) That includes any disputes brought by Rocky Brown's "successors, assigns, agents, attorneys, third party beneficiaries, insurers,

2

heirs, trustees and representatives, including the personal representative or executor of the estate, the spouse, children, grandchildren, all decedents and next friends, and any person whose claim is derived through the Resident." (Id. ¶ 5.) Around November 28, 2017, Rocky Brown was transferred from Quince Nursing and Rehabilitation Center to Saint Francis Hospital. (ECF No. 1-1 ¶ 2.) On March 31, 2018, Rocky Brown died at the hospital. (Id.)

On August 22, 2018, Jamarcus Brown, Rocky Brown's son, brought this negligence and survival and wrongful death action against Quince in Tennessee state court. (Id.) Jamarcus Brown alleges that injuries Rocky Brown sustained at Quince Nursing and Rehabilitation Center led to Rocky Brown's death. (ECF No. 1-1 ¶¶ 20-23.) On October 24, 2018, Quince removed this action to federal court. (ECF No. 1.) On November 2, 2018, Quince filed its Motion to Compel Arbitration and Stay Proceedings ("Motion to Compel"), arguing that the Agreement Pratchart signed when Rocky Brown was admitted binds the parties to arbitration.[1] (ECF No. 8-1 at 5-8.)

---

[1] In addition to the nursing home as a facility defendant, Jamarcus Brown names other defendants, including corporate defendants and individuals (the "Non-Facility Defendants"). (See ECF No. 1-1.) Those Non-facility Defendants have filed a concurrent Motion to Dismiss. (ECF No. 9.) The Non-Facility Defendants argue that, if the Court has jurisdiction over them, the Agreement also binds Jamarcus Brown to arbitration on claims against them. (ECF No. 8-1 at 1 n.1.)

On February 7, 2019, after referral by the Court, the Magistrate Judge issued a Report and Recommendation addressing Quince's Motion to Compel. (ECF No. 31.)  The Report recommends denying the Motion. (Id. at 8.)  On February 21, 2019, Quince objected to the Report's recommendations (the "Objections"). (ECF No. 32.)  On March 1, 2019, Jamarcus Brown responded to Quince's Objections. (ECF No. 34.)

On May 23, 2019, Quince filed a supplemental memorandum further objecting to the Report ("Supplemental Objections"). (ECF No. 36.)  On June 4, 2019, Jamarcus Brown filed a Motion to Strike Quince's Supplemental Objections ("Motion to Strike"). (ECF No. 37.)  On June 18, 2019, Quince filed a response to Jamarcus Brown's Motion to Strike. (ECF No. 39.)  On June 24, 2019, Jamarcus Brown filed a motion for leave to file reply, and attached a proposed reply to Quince's response to the Motion to Strike. (ECF Nos. 40, 40-1.)

On August 27, 2019, Quince filed a Motion to Stay the case pending resolution of its Motion to Compel. (ECF No. 42.)  After briefing, the Court granted Quince's Motion to Stay and held the case in abeyance pending resolution of Quince's Motion to Compel. (ECF No. 46.)

On December 31, 2019, Jamarcus Brown filed a Notice of Supplemental Authority, arguing the applicability of the Tennessee

Court of Appeals December 16, 2019 decision in <u>Jones v. Allenbrooke</u>
<u>Nursing & Rehab. Ctr., LLC</u>, No. W201900448COAR3CV, 2019 WL 6842372
(Tenn. Ct. App. Dec. 16, 2019) to his Motion to Compel.  (ECF No.
50.)  On January 31, 2020, Quince responded to Jamarcus Brown's
supplemental authority, arguing that <u>Jones</u> was inapposite.  (ECF
No. 57.)  On February 12, 2020, Jamarcus Brown replied.  (ECF No.
58.)

**II. Jurisdiction**

The Court has diversity jurisdiction.  28 U.S.C. § 1332.
Although a specific amount has not been pled, the Court is
satisfied that the amount in controversy exceeds $75,000 because
Jamarcus Brown is seeking compensatory and punitive damages for
survival and wrongful death claims against multiple defendants.
(<u>See</u> ECF No. 1-1 ¶ 50; <u>see also</u> ECF No. 1 ¶ 5.)

The parties are completely diverse.  Rocky Brown was a citizen
of Tennessee at the time of his death.  (ECF No. 1-1 at 8 ¶ 2; <u>see</u>
<u>also</u> No. 1 ¶ 6).  For diversity purposes, Jamarcus Brown is also
a citizen of Tennessee.  <u>See</u> 28 U.S.C. § 1332(c)(2) (the legal
representative of the estate of a decedent is deemed to be a
citizen of the same state as the decedent).  None of the defendants
is a citizen of Tennessee.  Quince is a Tennessee limited liability
company.  (ECF No. 1 ¶ 6.)  Aurora Cares is a New York limited
liability company.  (ECF No. 1-1 ¶ 5.)  For purposes of diversity

jurisdiction, limited liability companies have the citizenship of each of their members. Americold Realty Tr. v. Conagra Foods, Inc., 136 S. Ct. 1012, 1015 (2016) (citing Carden v. Arkoma Associates, 494 U.S. 185, 195-96 (1990)); accord Delay v. Rosenthal Collins Grp., LLC, 585 F.3d 1003, 1005 (6th Cir. 2009). The members of Quince and Aurora Cares are D&N, LLC and DTD HC, LLC, who are also named defendants in this lawsuit. (See ECF No. 1 ¶ 7; No. 1-1 ¶¶ 4-7.) D&N, LLC and DTD HC, LLC are New York limited liability companies. (ECF No. 1 ¶ 7.) D&N, LLC's members are Norbert A. Bennett, the Norbert A. Bennett Children's Trust, and the Norbert A. Bennett Grand-Children's Trust. (Id.) Norbert Bennett, another named defendant, is a citizen of New York. (Id.) The citizenship of a traditional trust is that of its trustee. See GBForefront, L.P. v. Forefront Mgmt. Grp., LLC, 888 F.3d 29, 38-40 (3d Cir. 2018) (citations omitted). The trustee of the Norbert A. Bennett Children's Trust and the Norbert A. Bennett Grand-Children's Trust is Ronald Bennett, who is also a citizen of New York. (ECF No. 1 ¶ 7.) DTD HC, LLC's members are Donald T. Denz and the Donald T. Denz Irrevocable Trust. (ECF No. 1 ¶ 8.) Donald T. Denz, another named defendant, is a citizen of New York. (Id.) The trustee of the Donald T. Denz Irrevocable Trust is Martin Clifford, who is also a citizen of New York. (Id.) The Court has diversity jurisdiction because the parties are

completely diverse and the amount in controversy exceeds $75,000.
28 U.S.C. § 1332.

### III. Standard of Review

### A.   Report and Recommendation

Congress enacted 28 U.S.C. § 636 to relieve the burden on the
federal judiciary by permitting the assignment of certain district
court duties to magistrate judges.  See United States v. Curtis,
237 F.3d 598, 602 (6th Cir. 2001) (citing Gomez v. United States,
490 U.S. 858, 869-70 (1989)); see also Baker v. Peterson, 67 F.
App'x 308, 310 (6th Cir. 2003).  This Circuit has not directly
addressed whether a motion to compel arbitration and stay
proceedings is a dispositive motion.  The reasoning of the majority
of courts in this Circuit that have addressed this issue is
persuasive.  See Curatola v. TitleMax of Tennessee, Inc., 2018 WL
2728037, at *3-4 (W.D. Tenn. June 6, 2018) (collecting cases).  A
motion to compel arbitration and stay proceedings is a dispositive
motion.  See id.

A district court may refer dispositive motions to the
magistrate judge for a report and recommendation.  See 28 U.S.C.
§ 636(b)(1)(B); see also Vogel v. U.S. Office Prod. Co., 258 F.3d
509, 515 (6th Cir. 2001).  For reports and recommendations on
dispositive motions, "[t]he district judge must determine de novo
any part of the magistrate judge's disposition that has been

7

properly objected to." See Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1). After reviewing the evidence, the court is free to accept, reject, or modify the magistrate judge's proposed findings or recommendations. 28 U.S.C. § 636(b)(1). The district court is not required to review -- under a de novo or any other standard -- those aspects of the report and recommendation to which no objection is made. Thomas v. Arn, 474 U.S. 140, 150 (1985). The district court should adopt the magistrate judge's findings and rulings to which no specific objection is filed. See id. at 151.

### B. Motion to Compel Arbitration

The Federal Arbitration Act ("FAA") strongly favors arbitration. See Albert M. Higley Co. v. N/S Corp., 445 F.3d 861, 863 (6th Cir. 2006); EEOC v. Waffle House, Inc., 534 U.S. 279, 289 (2002). "When a suit is brought in federal court on issues that by written agreement are subject to arbitration, the Federal Arbitration Act requires that the court in which the suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration[,] shall stay the trial of the action." O.J. Distrib., Inc. v. Hornell Brewing Co., 340 F.3d 345, 355 (6th Cir. 2003) (alterations omitted) (quotation marks omitted).

The showing necessary to compel arbitration absent trial is the same as the showing necessary for summary judgment in a civil

suit.  Great Earth Companies, Inc. v. Simons, 288 F.3d 878, 889 (6th Cir. 2002).  The moving party must "clearly and convincingly establish[] the nonexistence of any genuine issue of material fact, and the evidence . . . must be read in a light most favorable to the party opposing the motion."  Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986).  In particular, the moving party must show the existence of "a binding agreement to arbitrate."  In re First Thermal Sys., Inc., 182 B.R. 510, 513 (Bankr. E.D. Tenn. 1995).

**IV.  Analysis**

The "savings clause" of the FAA allows courts to refuse to enforce arbitration agreements "upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2; Gaffers v. Kelly Servs., Inc., 900 F.3d 293, 296 (6th Cir. 2018). This clause allows courts to invalidate arbitration agreements because of "generally applicable contract defenses," but not because of "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue."  Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1622 (2018) (citing AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011)). State law of contract formation governs "generally applicable contract defenses."  See GGNSC Louisville St. Matthews LLC v. Badgett, 728 F. App'x 436, 440 (6th Cir. 2018) (citing First

9

Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995)).

Jamarcus Brown relies on one such ground under Tennessee law[2]: lack

of authority.  (ECF No. 10 at 3-7.)

Under the Tennessee Health Care Decisions Act ("THCDA"), "[a]

surrogate may make a health care decision for a patient who is an

adult or emancipated minor, if, and only if: (1) [t]he patient has

been determined by the designated physician[3] to lack capacity;[4]

and (2) [n]o agent or guardian has been appointed or the agent or

guardian is not reasonably available."  Tenn. Code Ann. § 68-11-

1806(b)(1)-(2); see also Barbee v. Kindred Healthcare Operating,

Inc., 2008 WL 4615858, at *10-11 (Tenn. Ct. App. Oct. 20, 2008).

Under the THCDA, "a person is presumed to have the capacity to

make his or her own health care decisions."  McKey v. Nat'l

Healthcare Corp., 2008 WL 3833714, at *3 (Tenn. Ct. App. Aug. 15,

2008) (citing Tenn. Code Ann. 68-11-1812).  "To overcome that

---

[2] The Report recommends that Tennessee substantive law apply to the
parties' dispute.  (ECF No. 31 at 5-6.)  Neither party objects to that
recommendation.  (ECF No. 32 at 2.)  The Court adopts it.  See Arn, 474
U.S. at 151.

[3] A "[d]esignated physician" is "a physician designated by an individual
or the individual's agent, guardian, or surrogate, to have primary
responsibility for the individual's health care or, in the absence of a
designation or if the designated physician is not reasonably available,
a physician who undertakes such responsibility[.]"  Tenn. Code Ann. § 68-
11-1802(4).

[4] "'Capacity' means an individual's ability to understand the significant
benefits, risks, and alternatives to proposed health care and to make
and communicate a health care decision[.]"  Tenn. Code Ann. § 68-11-
1802(3).

presumption, the statute requires a determination by a physician that the patient lacks capacity." Id. (citing Tenn. Code Ann. § 68-11-1806(b)).  A party seeking to prove that it has overcome the presumption must provide "clear, cogent, and convincing" proof of the individual's lack of capacity. Bockelman v. GGNSC Gallatin Brandywood LLC, 2015 WL 5564885, at *4 (Tenn. Ct. App. Sept. 18, 2015) (citing Ralston v. Hobbs, 306 S.W.3d 213, 219 (Tenn. Ct. App. 2009)). "Clear, cogent, and convincing proof" means that there is "'no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" Id. (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). The burden of proving that one had authority to make health care decisions for another under the THCDA lies with the party seeking to establish that authority. See Barbee, 2008 WL 4615858, at *12; cf. In re Jones, 585 B.R. 465, 512 (Bankr. E.D. Tenn. 2018) (under Tennessee law, "[t]he party seeking to assert agency must prove its existence . . .").

**A. Motion to Strike**

On June 6, 2019, Jamarcus Brown filed his Motion to Strike Quince's Supplemental Objections. (ECF No. 37.) Jamarcus Brown argues that Quince's Supplemental Objections are untimely, immaterial, and redundant. (ECF No. 37-1.) Jamarcus Brown argues that the Federal Rules and Local Rules only allow objections to be

filed 14 days after a Report has been issued and that Quince's Supplemental Objections were filed 105 days after the Report was issued. (See ECF No. 37-1 at 3-4); Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1); LR 72.1(g)(2). Jamarcus Brown contends that Quince's arguments that the Agreement is not a contract of adhesion, not oppressive, and not unconscionable are immaterial because the question before the Court is not the terms of the Agreement, but the existence of a valid agreement. (See ECF No. 37-1 at 4-5.) He argues that Quince's third-party beneficiary argument fails because Tennessee state law has expressly rejected that argument in a similar factual situation.[5] (Id. at 4-6.)

All of Jamarcus Brown's arguments have merit. It is well-settled that parties have 14 days to file written objections after a magistrate judge has issued a report and recommendation on a dispositive motion, see Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1); LR 72.1(g)(2), and that a party may respond to another party's objections within 14 days after being served with a copy of the objections, Fed. R. Civ. P. 72(b)(2); LR 72.1(g)(2). It is also well-settled that parties are not allowed to raise -- and the Court need not consider -- new arguments or issues that were

---

[5] Jamarcus Brown also contends that Quince's arguments on the enforceability issue are redundant because Quince raised those arguments in its initial Objections. (ECF No. 37-1 at 6.)

not presented in the first instance to the magistrate judge.  <u>See</u>
<u>Murr v. United States</u>, 200 F.3d 895, 902 n.1 (6th Cir. 2000).

Here, the Magistrate Judge issued her Report on February 7,
2019.  (ECF No. 31.)  Quince objected to the Report on February
21, 2019.  (ECF No. 32.)  Jamarcus Brown responded to Quince's
Objections on March 1, 2019.  (ECF No. 34.)  Those filings were
timely.  <u>See</u> Fed. R. Civ. P. 72(b)(2).  On May 23, 2019, however,
Quince filed Supplemental Objections, further objecting to the
Report and making new legal arguments.  (<u>See</u> ECF No. 36.)  The
Supplemental Objections were filed 105 days after the Report had
been issued.  (<u>See</u> <u>id.</u>; ECF No. 31.)  The filing was untimely.
<u>See</u> Fed. R. Civ. P. 72(b)(2).  Normally, the Court would not
consider it.  <u>See</u> <u>Allen v. Comm'r of Soc. Sec.</u>, 2017 WL 3055516,
at *1 (W.D. Tenn. July 19, 2017), <u>aff'd</u>, 2018 WL 4042464 (6th Cir.
June 4, 2018).  Any objections raised in it would be deemed
forfeited.  <u>Id.</u>

This situation, however, is unusual.  It its initial
Objections, Quince argues that the Report is "premature" because
the scheduling order for the case listed March 1, 2019, as the
deadline for the parties to fully brief the Motion to Compel.  (ECF
No. 32 at 4-5.)  Quince argues that it "ha[d] not had an opportunity
to fully brief the Motion" when the Magistrate Judge issued her
Report.  (<u>Id.</u>)  Quince filed its Motion to Compel on November 2,

13

2018. (ECF No. 8.) Jamarcus Brown responded on November 14, 2018. (ECF No. 10.) Quince did not file a reply. On January 14, 2019, the Court entered a Scheduling Order that set February 1, 2019, as the deadline for the parties to conduct arbitration-related discovery and March 1, 2019, as the deadline for briefing the arbitration issue. (ECF No. 23.) The Magistrate Judge issued her Report on February 7, 2019. (ECF No. 31.) The Report was issued before the Scheduling Order deadline for further briefing the arbitration question.

To "effectively discharge its judicial responsibilities[,]" the Court will address Quince's untimely Supplemental Objections. See Vogel, 258 F.3d at 515 ("[W]here a party files objections after [fourteen] days, a district court can still consider them.") (citing Patterson v. Mintzes, 717 F.2d 284, 286-87 (6th Cir. 1983) (recognizing that a district court has authority to extend the time limits of 28 U.S.C. § 636(b)(1) and that an extension may allow a court to "preserve[] the opportunity to render a more fully informed opinion and thereby effectively discharge its judicial responsibilities")); see also LR 1.1(e) ("[T]he Court may deviate from any provision of any Local Rules of this Court, when appropriate for the needs of the case and the administration of justice."). There is no prejudice to Jamarcus Brown. Jamarcus Brown's Motion to Strike is DENIED.

**B. The Report's Recommended Findings and Quince's Objections**

The Report recommends denying Quince's Motion to Compel. (ECF No. 31 at 8.)  The Report recommends finding that "there is no evidence before the Court to demonstrate that [Rocky Brown's] designated physician properly determined that he lacked capacity." (Id. at 7-8.)  Applying Tennessee law, the Report recommends concluding that, because there was no evidence that Rocky Brown lacked capacity, Pratchart could not make a health care decision for him.  (Id. at 8.)  Because Pratchart did not have authority to make health care decisions for Rocky Brown, she did not have the authority to sign the Agreement on his behalf.  (Id.); see Barbee, 2008 WL 4615858, at *11 (execution of documents admitting patient to nursing home, including execution of an arbitration agreement, is clearly a "health care decision" within the meaning of the THCDA) (citing Owens v. Nat'l Health Corp., 263 S.W.3d 876, 884-85 (Tenn. 2007)).  The Report concludes that there is no valid arbitration agreement binding Rocky Brown and recommends that Quince's Motion to Compel be denied.  (Id.)

In its Objections, Quince argues that: (1) the Report errs in determining the arbitrability question because the Agreement delegates the decision about enforceability of the Agreement to an arbitrator, (ECF No. 32 at 2-3); and (2) the Report errs in concluding that there is no evidence that a designated physician

determined that Rocky Brown lacked capacity, (ECF No. 32 at 3-4).
In its Supplemental Objections, Quince argues that: (3) the
Agreement is not a contract of adhesion, (ECF No. 36 at 2-3); (4)
the Agreement's terms are not oppressive or unconscionable, (id.
at 4-6); and (5) the Agreement is enforceable against Rocky Brown
because he is a third-party beneficiary of the Agreement,[6] (id. at
6).

### 1. Authority to Decide Arbitrability

Quince argues that the magistrate judge should not have
decided whether the parties' dispute should be subject to
arbitration.  (ECF No. 32 at 2-3.)  Quince argues that the
Agreement clearly states that any determination about the
enforceability of the Agreement is subject to arbitration and that
the Court has no authority to decide that question.  (Id.) (citing
ECF No. 8-2 ¶ 3 ("[A]ny disputes arising out of or in any way
relating to this Agreement (its enforceability), the Admission
Agreement, or any of the Resident's stays at the Facility [shall
be submitted to binding arbitration] . . . irrespective of the
legal theories upon which the claim is asserted.")).

Quince's argument fails.  There is a substantive distinction
between questions of contractual enforceability and questions of

---

[6] Quince again raises its argument that that the Agreement has a
delegation clause that delegates the question of enforceability to the
arbitrator.  (ECF No. 36 at 6-7.)

16

contractual existence.[7]   See In re: Auto. Parts Antitrust Litig.,
951 F.3d 377, 385 (6th Cir. 2020).   The former may be contracted
away, see Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 68-72
(2010); the latter is reserved to the courts, see Granite Rock Co.
v. Int'l Bhd. of Teamsters, 561 U.S. 287, 296-300 (2010).

A court is responsible under the FAA for determining whether
a valid agreement exists.   See 9 U.S.C. § 3; Mazera v. Varsity
Ford Mgmt. Servs., LLC, 565 F.3d 997, 1001 (6th Cir. 2009) ("The
court 'must determine whether the dispute is arbitrable, meaning
that a valid agreement to arbitrate exists between the
parties . . . .'") (quoting Landis v. Pinnacle Eye Care, LLC, 537
F.3d 559, 561 (6th Cir. 2008)).   Questions of contractual existence
are for courts to decide, not arbitrators.   See Granite Rock Co.,
561 U.S. at 296 (stating that it is "well settled that where the
dispute at issue concerns contract formation, the dispute is
generally for courts to decide") (collecting cases); Burden v.
Check Into Cash of Kentucky, LLC, 267 F.3d 483, 491 (6th Cir. 2001)
("[I]ssues relating to the making of an arbitration
agreement, . . . are to be determined by the court, not the

---

[7] "In the context of an arbitration agreement, an agreement to arbitrate
threshold issues concerning the arbitration agreement is known as a
delegation provision." Edwards v. Allenbrooke Nursing & Rehab. Ctr.,
LLC, 2017 WL 4861658, at *3 (Tenn. Ct. App. Oct. 26, 2017). Here, Quince
argues that the Agreement properly delegated any questions of
enforceability to the arbitrator. (ECF No. 32 at 2-3) (citing ECF No.
8-2 ¶ 3.)

arbitrator.") (citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404 (1967)); Owens, 263 S.W.3d at 883 ("[C]ontract formation questions are to be decided by the court, not by an arbitrator.") (citation omitted).

Here, any authority the Court has to compel arbitration derives from the existence of a contract that binds Rocky Brown. The parties dispute whether Pratchart had authority to bind Rocky Brown to the Agreement. If Pratchart could not bind Rocky Brown, there is no contract and Rocky Brown is not bound to arbitration. See McKey, 2008 WL 3833714, at *2 (in order to bind resident of nursing home to an arbitration agreement, the mother or sister who signed the agreement had to have authority to act as resident's agent or surrogate); cf. United Steelworkers of Am. v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582 (1960) ("[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."). Questions of signatory authorization are to be decided by the court. See, e.g., Sandvik AB v. Advent Int'l Corp., 220 F.3d 99, 108 (3d Cir. 2000) (holding that a company was not entitled to arbitration under an agreement with another company where one company disputed the existence of a binding contract by alleging that the individual who signed the agreement on its behalf lacked authority; under FAA, court was required to decide whether there was agreement to

18

arbitrate before it could order arbitration); Sphere Drake Ins. Ltd. v. All Am. Ins. Co., 256 F.3d 587, 591 (7th Cir. 2001) (holding that whether one party had authority to bind the other, or whether it had overstepped its authority, was to be decided in courts rather than under the contract's arbitration provision because the issue went to existence of the contract). Sixth Circuit case law "strongly suggests that [a] district court has the authority to determine whether [a] signature on an arbitration agreement is valid in advance of compelling arbitration in accordance with that agreement." Taylor v. Pilot Corp., 955 F.3d 572, 577 (6th Cir. 2020).

Because Jamarcus Brown challenges the existence of a valid, binding arbitration agreement and not the Agreement's enforceability, the question is for the Court to decide. See Jones, 2019 WL 6842372, at *2 (affirming trial court's decision in deciding the contract formation question where "the gravamen [wa]s whether the arbitration agreement was properly formed, i.e., whether [the signatory] had authority to bind [the resident] to the Agreement"); Edwards v. Allenbrooke Nursing & Rehab. Ctr., LLC, 2017 WL 4861658, at *1 (Tenn. Ct. App. Oct. 26, 2017) (affirming a trial court's conclusion that the enforceability question was to be decided in arbitration, but the question of existence (i.e., that "there was never any binding arbitration

19

agreement in the first place") was a question for the court to decide). ).  The Court has authority to decide whether a contract exists.

Quince relies on the recent decision in Henry Schein, Inc. v. Archer & White Sales, Inc. to support its argument to the contrary. 139 S. Ct. 524, 528 (2019); (ECF No. 32 at 2-3).  Henry Schein held that if a party's contract delegates the question of enforceability of a dispute to arbitration, a court may not override the contract and decide the enforceability question, even if it thinks the argument that the arbitration agreement applies to a dispute is "wholly groundless." Id. at 529-31.  That holding is not applicable here.  Henry Schein reconfirmed the rule that whether a valid arbitration agreement exists is a decision to be decided by the court before referring the dispute to an arbitrator. Id. at 530 ("To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists.") (citing 9 U.S.C. § 2).  Henry Schein reconfirmed the distinction between whether an arbitration agreement exists –- a matter to be decided by the court –- and whether an arbitration agreement is enforceable on a specific claim -- a decision left to the arbitrator (if properly delegated). See 139 S. Ct. at 528-530.

20

Quince also relies on two orders in this District in which the Court granted motions to compel arbitration based on Henry Schein as applied to facts similar to those here. See Foley v. Allenbrooke Nursing and Rehab. Ctr., LLC, 2:18-cv-02741-JPM-cgc, ECF No. 52 (W.D. Tenn. May 2, 2019); Farwell v. Quince Nursing and Rehab. Ctr., LLC, 2:18-cv-02795-JPM-dkv, ECF No. 20 (W.D. Tenn. May 2, 2019). The legal analysis in those orders is cursory. See Foley, 2:18-cv-02741-JPM-cgc, ECF No. 52 at 1-2; Farwell, 2:18-cv-02795-JPM-dkv, ECF No. 20 at 1-2. Foley and Farwell do not discuss the extensive case law distinguishing contractual enforceability and contractual existence. See Foley, 2:18-cv-02741-JPM-cgc, ECF No. 52 at 1-2; Farwell, 2:18-cv-02795-JPM-dkv, ECF No. 20 at 1-2. The Court in Foley and Farwell appears to have found that valid arbitration agreements existed. See 2:18-cv-02741-JPM-cgc, ECF No. 52 at 2; 2:18-cv-02795-JPM-dkv, ECF No. 20 at 2. Here, as discussed infra, the Court does not find that there was a valid agreement between Pratchart and Quince. Foley and Farwell are not apposite.

The question of Pratchart's authority goes to contractual existence. Because the Court has the authority to answer that question, and because the Court delegated that authority to the Magistrate Judge, the Magistrate Judge's determination of that question was proper. Quince's first objection is OVERRULED.

21

**2. Lack of Capacity**

Under the THCDA, a surrogate has authority to make a health care decision on behalf of a patient if a designated physician determines that the patient lacks capacity.  <u>See</u>  Tenn. Code Ann. § 68-11-1806(b)(1).   Quince objects to the Report's conclusion that there is no evidence a designated physician determined that Rocky Brown lacked capacity.  (ECF No. 32 at 3-4.)  Quince argues that an Appointment of Surrogate Form ("Surrogate Form" or "Form"), (ECF No. 8-3), definitively proves that Rocky Brown lacked capacity and properly designates Pratchart as Rocky Brown's surrogate.  (ECF No. 32 at 4-5.)   Quince argues that, because there was a determination that Rocky Brown lacked capacity, and because Pratchart was properly designated as his surrogate, Pratchart had authority to enter into the Agreement on Rocky Brown's behalf. (<u>Id.</u>)  The Court reviews this objection de novo.

The validly of Pratchart's authority to sign the Agreement on Rocky Brown's behalf turns on the sufficiency of the Surrogate Form to establish: (1) that a designated physician determined that Rocky Brown lacked capacity; and (2) that Pratchart was properly designated as Rocky Brown's surrogate.  <u>See</u> Tenn. Code Ann. § 68-11-1806(b)(1).  Quince does not establish the first.

Under an "APPOINTMENT OF SURROGATE" heading, the Surrogate Form provides: "Complete Section 1 if Resident has capacity." (ECF

No. 8-3 at 1.)  Section 1 is not filled out.  (Id.)  At the bottom of Section 1, it provides: "Complete Section 2 in addition to Section 1 if unsure of Resident's capacity.  Complete only Section 2 if Resident clearly lacks capacity." (Id.)  Section 2 is filled out in part.  (Id.)  It provides: "Gladys Pratchart [handwritten] is designated as surrogate for Rocky Brown [handwritten]." (Id.) There are checkmarks next to different "[r]easons for [a]ppointment" and a checkmark indicating that the appointed surrogate is "[t]he patient's parent." (Id.)

The following part of the Surrogate Form is titled "ACCEPTANCE OF SURROGATE SELECTION." (Id. at 2.)  The "Surrogate Contact Information" part is incomplete, but the following part is filled out and provides: "I accept the appointment of surrogate for this Resident and understand I have the authority to make all health care related decisions for Rocky Brown [handwritten] including the signing of an arbitration agreement." (Id.)  Pratchart appears to have signed this statement, and it is dated April 17, 2017 (the same day the Agreement was signed). (See id.)

The last part of the Surrogate Form is titled "PHYSICIAN NOTIFICATION AND APPROVAL." (Id.)  It provides:

> I, Mukesh Jain [handwritten], am the physician who has primary responsibility for the health care of Rocky Brown [handwritten].  I find that the Resident (please check one):
>
>    ☐ lacks capacity    ☐ has capacity

> to understand the significant benefits, risks, and
> alternatives to proposed health care and to make and
> communicate a health care decision.  I agree with the decision
> to appoint this surrogate.  It is my opinion that this is
> true both on the day the surrogate accepted the appointment
> and today.  It is my intention that the designation of
> surrogate is effective back to the date of acceptance by the
> surrogate, so that healthcare decisions made by the surrogate
> for the resident back to that day are valid.

(Id.)  Neither the "lacks capacity" nor the "has capacity" box has been checked.  (Id.)  Beneath this paragraph is a space for the "Signature of Designated Physician," which contains an illegible signature, and a space for the date, which is blank.  (See id.) The Surrogate Form is the only evidence that Quince submits to establish that a designated physician determined that Rocky Brown lacked capacity before Pratchart signed the Agreement on Rocky Brown's behalf.  It is not enough.

Quince argues that, although the "lacks capacity" box on the Surrogate Form was not checked, because the Form instructed that Section 2 be completed only if the Resident lacked capacity, because only Section 2 was completed, and because Jain signed the Form with only Section 2 completed, the logical inference is that Rocky Brown lacked capacity.  (See ECF No. 32 at 4.)

Following the Surrogate Form's instructions, alone, does not conclusively establish that Rocky Brown lacked capacity.  It is not "clear, cogent, and convincing" proof that a designated

24

physician determined that Brown lacked capacity.[8]  See Bockelman,
2015 WL 5564885, at *4.  Because neither the "lacks capacity" nor
the "has capacity" box is checked, there is a "serious [and]
substantial doubt" about whether a capacity determination or
conclusion was reached.  See id.  One court has reasoned that, if
presented with the opportunity, a physician's failure to
affirmatively make a capacity determination one way or the other
undermines the conclusion that an individual is incapacitated.
See Cabany v. Mayfield Rehab. & Special Care Ctr., 2007 WL 3445550,
at *5-6 (Tenn. Ct. App. Nov. 15, 2007).  Other courts have also
declined to imply a determination of incapacity when there is
inadequate evidence that a physician made any capacity
determination.  See, e.g., Hattiesburg Health & Rehab Ctr., LLC v.
Brown, 176 So. 3d 17, 22 (Miss. 2015).

Even if it were clear what determination Jain made, it is
unclear when he made that determination.  In the ACCEPTANCE OF
SURROGATE SELECTION part of the Surrogate Form, Pratchart's
signature is dated April 17, 2017.  (See ECF No. 8-3 at 2.)  In
the PHYSICIAN NOTIFICATION AND APPROVAL part of the Surrogate Form,

---

[8] It is also unclear who completed the Surrogate Form – Pratchart or
Jain.  If Pratchart filled out the Form and followed the instructions
on which Quince relies, the Form would be insufficient.  Only a
designated physician can make a capacity determination.  See Tenn. Code
Ann. § 68-11-1806(b)(1).

Jain's signature is not dated.[9]   (See id.)   One might infer that any determination Jain made was on the same day that Pratchart signed the Surrogate Form.   (See id.)   One could also conclude, based on the language in the relevant paragraph, that any determination Jain might have made, was made on a later date.   (See id.) ("It is my opinion that this is true both on the day the surrogate accepted the appointment and today.") (emphasis added). It is unclear whether Rocky Brown was determined to be incapacitated, but it is also unclear whether he was determined to be incapacitated before the relevant health care decision was made for him (i.e., Pratchart's signing the Agreement).   See Dykes v. Cleveland Nursing & Rehab. Ctr., 2016 WL 426546, at *5-6 (N.D. Miss. Feb. 3, 2016) (finding a similar "Resident and Facility Arbitration Agreement" form invalid because the physician signed the "Physician Notification and Approval" part stating that the resident lacked capacity a month after the "Acceptance of Surrogate Selection" part was signed).

At best, the way the Surrogate Form is filled out creates a dispute about whether Rocky Brown lacked capacity.   That is insufficient for Quince to carry its burden.[10]   See Barbee, 2008

---

[9] This relies on the assumption that the illegible signature is Jain's.

[10]  This conclusion is supported by the traditional and statutory presumptions that one has capacity, see In re Conservatorship of Groves, 109 S.W.3d 317, 329-30 (Tenn. Ct. App. 2003) ("[I]t is well-settled that the law presumes that adult persons are . . . capable, rather than

WL 4615858, at *12; see also Bockelman, 2015 WL 5564885, at *4. The Recommendation that there is insufficient evidence that a designated physician determined that Rocky Brown lacked capacity before a health care decision was made on his behalf is correct. Quince's second objection is OVERRULED.

### 3. Contract as one of Adhesion, as Oppressive, or as Unconscionable

Quince argues that the Agreement is valid because it is not a contract of adhesion and its terms are not oppressive or unconscionable. (See ECF No. 36 at 2-6.) Those arguments are not germane because the Report correctly concludes that the Agreement is invalid on other grounds, specifically, that Pratchart did not have the proper authority to enter into the Agreement on Rocky Brown's behalf. (ECF No. 31 at 8.) The third and fourth objections in Quince's Supplemental Objections are OVERRULED.

### 4. Third-Party Beneficiary

Quince argues that the Agreement is enforceable against Rocky Brown because he is a third-party beneficiary. (ECF No. 36 at 6.)

---

incapable, to direct their personal affairs until satisfactory evidence to the contrary is presented."); Tenn. Code Ann. § 68-11-1812(b), and by the strong rights and policy interests underlying the THCDA. See McKey, 2008 WL 3833714, at *5 ("The [THCDA] affects a person's fundamental right to personal autonomy. In light of the important interests at stake, we have concluded that it is essential that the requirements of the [THCDA] be met before a person can be deprived of the right to make his or her own health care decisions.") (citation omitted).

"Generally, contracts are presumed to be 'executed for the benefit of the parties thereto and not third persons.'" Owner-Operator Indep. Drivers Ass'n, Inc. v. Concord EFS, Inc., 59 S.W.3d 63, 68 (Tenn. 2001) (quoting Oman Constr. Co. v. Tenn. Cent. Ry. Co., 370 S.W.2d 563, 572 (Tenn. 1963)).  There is an exception to that rule when "the contracting parties express an intent that the benefits of the contract flow to a third party." Id.  Those "third-party beneficiaries" "may enforce a contract if they are intended beneficiaries of the contract." Id. (citations omitted).  In Tennessee, "a third party is an intended third-party beneficiary of a contract, and thus entitled to enforce the terms of a contract, where (1) the parties to the contract have not otherwise agreed, (2) recognition of the third-party's right to performance is appropriate to effectuate the parties' intent, and (3) terms or circumstances indicate that performance of the promise is intended or will satisfy an obligation owed by the promisee to the third party." Benton v. Vanderbilt Univ., 137 S.W.3d 614, 618 (Tenn. 2004) (citing Owner-Operator Independent Drivers Association, 59 S.W.3d at 70).

The Agreement provides, "The Resident will be considered to be a third party beneficiary of this Agreement and is intended to benefit directly from the execution of this Agreement in conjunction with the corresponding admission(s) and receipt of

28

services."  (ECF No. 8-2 ¶ 2.)  Quince argues that this language requires the Court to enforce the Agreement against Rocky Brown. (ECF No. 36 at 6.)  Quince cites <u>Benton</u> for the proposition that "the Tennessee Supreme Court . . . has expressly found that a non-signatory to an arbitration agreement may be bound under a third-party beneficiary theory."  (ECF No. 57 at 3) (citing <u>Benton</u>, 137 S.W.3d at 614).

Quince's reliance on <u>Benton</u> is misplaced.  <u>Benton</u> held that "an arbitration provision in a contract is binding against a third-party beneficiary <u>who brings an action seeking to enforce the terms of that contract</u>."  <u>Benton</u>, 137 S.W.3d at 618 (emphasis added). <u>Benton</u> is distinguishable because Rocky Brown, the alleged third-party beneficiary, is not "bring[ing] an action seeking to enforce the terms of th[e] contract."  <u>Id.</u>  The claims brought by the plaintiff in <u>Benton</u> – abuse of process, breach of contract, and a violation of the Tennessee Consumer Protection Act – derived from the contract that contained the arbitration provision.  <u>See id.</u> at 16.  The court in <u>Benton</u> decided not to allow a plaintiff to "have his cake and eat it too" by allowing him to enforce certain favorable provisions of a contract while avoiding provisions that the plaintiff viewed as unfavorable.  <u>See id.</u> at 619-20 ("Thus, where a third-party beneficiary seeks to enforce rights under a contract, an interpretation of the contract as a whole requires

that the third party not be permitted to interpret the contract in a piecemeal fashion by avoiding unfavorable terms.").

Here, Jamarcus Brown, on behalf of Rocky Brown, is not bringing contract claims or "seeking to enforce the terms of the contract," but bringing tort claims of negligence and survival and wrongful death that do not directly relate to the terms of the Agreement. (See ECF No. 1-1 ¶¶ 24-47.) Benton specifically said that its analysis "is applicable only to actions brought by a third-party beneficiary seeking to enforce rights under that contract" and that "[a]n arbitration provision may not be applicable in cases where claims are raised under other legal theories and are not intertwined with rights being enforced under the terms of the contract." Benton, 137 S.W.3d at 620 (emphasis added) (citations omitted). Benton distinguished a case where a third-party beneficiary argument was rejected on the basis that that case alleged a tort claim. See id. (referencing Cocke Cty. Bd. of Highway Comm'rs v. Newport Utilities Bd., 690 S.W.2d 231, 237 (Tenn. 1985)).

This Court and Tennessee courts have rejected the third-party beneficiary argument that Quince makes here. See, e.g., Hardaway v. Quince Nursing & Rehab. Ctr., LLC, No. 2:19-2464, 2020 WL 1918244, at *4-6 (W.D. Tenn. Apr. 20, 2020); Jones, 2019 WL 6842372, at *6; Ricketts v. Christian Care Ctr. of Cheatham Cty.,

30

Inc., 2008 WL 3833660, at *4 (Tenn. Ct. App. Aug. 15, 2008).   In

Ricketts, the Court rejected the argument that a nursing home

contract signed by a family member who did not have authority to

act on behalf of the resident created a contract between the family

member and the nursing home because the resident was a third-party

beneficiary of the contract.   2008 WL 3833660, at *4.   Ricketts

reasoned:

> Third party beneficiary concepts should not be used to
> circumvent the threshold requirement that there be a valid
> arbitration agreement.   [The family member] signed the
> admission agreement as [the resident's] "representative."
> She was not entering into a contract on her own behalf, but
> as her mother's representative.   The issue in this case is
> whether [the family member] had authority to act as her
> mother's agent and to enter into a contract on her behalf.
> If she did not have authority, there is no valid contract.
> Without a valid contract, there can be no third[-]party
> beneficiary.

Id.   Other courts are in accord.   See, e.g., Hattiesburg Health &

Rehab Ctr., LLC, 176 So. 3d at 22 (holding that, for a third-party

beneficiary to exist, there must first be a valid contract executed

by one who has authority); Licata v. GGNSC Malden Dexter LLC, 2

N.E.3d 840, 848 (Mass. 2014) (same).   The fifth argument in

Quince's Supplemental Objections is OVERRULED.

Because there is insufficient evidence that Rocky Brown

lacked capacity to make his own healthcare decisions, Pratchart

could not make health care decisions for him.   See   Tenn. Code

Ann. § 68-11-1806(b)(1).   Because Pratchart did not have authority

to make health care decisions for Rocky Brown, she did not have the authority to sign the Agreement on his behalf.  See Barbee, 2008 WL 4615858, at *12.  The Agreement does not bind Rocky Brown to arbitration.  Quince's Motion to Compel is DENIED.

## V.   Conclusion

For the foregoing reasons, the Report is ADOPTED.  Quince's Motion to Compel and Stay Proceedings is DENIED.  The Related Motions are DENIED.


So ordered this 12th day of August, 2020.


/s/   Samuel H. Mays, Jr.   ___
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE